# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

STACEY GALLAWAY,          )
                                )
                                )
          Plaintiff,         )
                                )        2:18-cv-01379-RJC
      v.                    )
                                )
RAND CORPORATION,      )
          Defendant.      )

## OPINION

**Robert J. Colville, United States District Judge.**

Pending before the Court is Defendant RAND Corporation's Motion for Summary Judgment.  (ECF No. 25).  For the reasons stated herein, the motion will be granted as to Plaintiff's claims of racial discrimination in Counts II and III and denied as to the remaining claims.

## I.    Introduction and Factual Background

### A.  Procedural History

This employment discrimination action was initiated by Plaintiff Stacey Gallaway ("Plaintiff") with the filing of a complaint on October 16, 2018. (ECF No. 1).  Count I alleges violations of the Equal Pay Act, 29 U.S.C. § 206(d); Count II alleges gender and race discrimination in violation of Title VII, 42 U.S.C. § 2000e-(2)(a)(1); Count III alleges racial discrimination in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

On December 14, 2018, Defendant RAND Corporation ("Defendant" or "RAND") filed an answer.  (ECF No. 7). Discovery ended on August 5, 2019 and the Court entered a Case Management Order setting forth a briefing schedule.  (ECF No. 22).  On September 20, 2019, RAND filed the now-pending Motion for Summary Judgment (ECF No. 25) with Brief in

Support (ECF No. 26), as well as a Concise Statement of Material Facts (ECF No. 27) and Appendix.  (ECF No. 28).  Plaintiff has filed a Brief in Opposition (ECF No. 31), a Concise Statement of Material Facts (ECF No. 33) ("Pl.'s Concise Stmt. of Facts"), and an Appendix thereto. (ECF No. 34).  RAND has filed a Reply Brief (ECF No. 35), an additional Concise Statement of Material Facts (ECF No. 36) and supplemental Appendix (ECF No. 37).  Plaintiff has filed a Response to RAND's Concise Statement of Material Facts.  (ECF No. 39).  The parties jointly filed a Combined Statement of Undisputed Material Facts ("CSUMF") as well. (ECF No. 40).

On February 4, 2020, this case was reassigned to this member of the Court for all further proceedings.  (ECF No. 41).

The matter is now ripe for consideration.

We have jurisdiction pursuant to 28 U.S.C. § 1331.

**B.  Factual Background**

Unless otherwise noted, the following facts are not in dispute, and are presented in the CSUMF.[1]

### The RAND Corporation and Contract Administrators

RAND is a research organization that develops solutions to public policy challenges to help make communities throughout the world safer and more secure, healthier and more prosperous. RAND is nonprofit, nonpartisan, and committed to the public interest. A crucial component of RAND's work centers on its Contracts and Grants Department and the Contract Administrators employed in that department.

Plaintiff is currently employed as a Contract Administrator ("CA").  She alleges RAND has paid her less than male CAs in her same department, the Contracts and Grants Department,

---

[1] The court will not cite to the record given that the facts in the CSUMF are undisputed.

which is a business support function responsible for assisting RAND's researchers in preparing grants and proposals. Those grants and proposals are prepared for submission to federal government agencies and other potential sponsors of research projects. The research projects funded by such grants and proposals are key sources of RAND's revenue.

RAND employs four levels of Contract Administrators: Contract Administrator I, Contract Administrator II, Contract Administrator III, and Contract Administrator IV (referred to as "CA I," "CA II," "CA III," and "CA IV," respectively).  As will be described more fully *infra*, after a fellow employee took medical leave in the Spring of 2017, assignments in the Contracts and Grants Department shifted.   Plaintiff believed she was entitled to a promotion as a result; her request in September 2017 to be moved from a CA I position to a CA III position was denied.   She was instead promoted to a CA II on December 11, 2017 with a salary increase.

By way of background, it is helpful to understand the different job descriptions, purposes and requirements of the CA levels.  The "Duties and Responsibilities" for each CA position are described identically, as CAs may perform any or all of the following duties:

- Provide advice to RAND research staff regarding proposal preparation and interpretation of client requirements.

- Draft contract terms and conditions acceptable to RAND and RAND's clients.

- Coordinate the negotiation of contract and grant awards with RAND clients.

- Interpret contract and grant terms and conditions and advise RAND management as to acceptability.

- Monitor active projects for compliance with client and RAND requirements and prepare periodic status reports.

- Facilitate problem identification and resolution in a variety of pre and post award areas.

- Assist with miscellaneous contractual matters such as copyrights and non-disclosure agreements and intellectual property matters.

•   Prepare, negotiate, administer, and monitor subcontract agreements.

•   Maintain cooperative working relationships with other offices within RAND sharing for proposal  preparation/contract  administration  and provide advice and assistance as needed.

•   Serve as primary liaison to RAND clients on substantial and/or sensitive contractual/business matters.

•   Coordinate the project close-out process.

•   Assist the Director of the Office in a wide variety of projects.

The job descriptions differ, however, in the prerequisite "Education and Work Experience" attendant to each position:

| Position | Education | Relevant Experience |
|---|---|---|
| CA I | Minimum: High School<br>Preferred: AS/AA | Minimum: 1-2 years<br>Preferred: None |
| CA II | Minimum: AS/AA<br>Preferred: BS/BA | Minimum: 3-5 years<br>Preferred: 6-8 years |
| CA III | Minimum: BS/BA<br>Preferred: None | Minimum: 6-8 years<br>Preferred: None |
| CA IV | Minimum: BS/BA<br>Preferred: MS/MA | Minimum: 6-8 years<br>Preferred: 9-10 years |

Plaintiff has a high school diploma but does not have an undergraduate or associate degree.  In 2017, when RAND promoted Plaintiff, all CA job descriptions were revised to include an "or equivalent experience" in the education requirements.

The stated "Primary Purpose" in each job description also varies:

| Position | Primary Purpose |
|---|---|
| CA I | "Under general supervision, performs *routine to moderately complex* contract and grant proposal preparation including pricing, negotiation and submission of all pertinent forms. Prepares periodic performance and strategy assessments for use in budget planning, developing forecasts and projections using established policies, procedures and guidelines." |

| CA II | "Under general supervision, performs *moderately complex to advanced* contract and grant proposal preparation including pricing, negotiation and submission of all pertinent forms. Prepares periodic performance and strategy assessments for use in budget planning, developing forecasts and projections using established policies, procedures and guidelines." |
|---|---|
| CA III | "Under minimal supervision, performs *advanced to highly complex* contract and grant proposal preparation including pricing, negotiation and submission of all pertinent forms. Prepares periodic performance and strategy assessments for use in budget planning, developing forecasts and projections using established policies, procedures and guidelines." |
| CA IV | "Under minimal supervision, performs *advanced to highly complex* contract and grant proposal preparation including pricing, negotiation and submission of all pertinent forms. Prepares periodic performance and strategy assessments for use in budget planning, developing forecasts and projections using established policies, procedures and guidelines." |

(emphasis added).

**Plaintiff Stacey Gallaway**

Plaintiff is an African American woman who currently is employed by RAND as a CA II with an annual salary of $77,000.  She has a high school diploma but she does not have a college or associate degree. Before being hired by RAND, Plaintiff's work experience included working at: 1) the Allegheny County Law Department as administrative Legal Assistant III where she tracked child support cases, and wrote court orders to collect child support fees and payments; 2) the law office of Rosalyn Guy-McCorkle as an Administrative Legal Secretary generating letters and miscellaneous correspondence, as well as handled billing and expenses; 3) Children's Hospital of Pittsburgh as an Administrative Assistant II scheduling, making traveling arrangements, and working on grants and "grant-related" issues; and 4) Keevican, Weiss, Bauerier & Hirsch as a legal secretary and software support specialist, completing secretarial tasks, data collection and software training.

Plaintiff began her employment at RAND's Pittsburgh location in February 2012 as a full-time Administrative Assistant III. After six months in the Administrative Assistant III role,

RAND promoted Plaintiff to Administrative Assistant IV/Research Department Assistant, increasing her salary from $48,000.00 per year to $53,000.00. Plaintiff kept working as an Administrative Assistant IV/Research Department Assistant until April 1, 2016, when RAND promoted her to a CA I position, increasing her salary to $60,000 per year. As a CA I, Plaintiff was assigned to work on RAND's "grant side" ("Grant Team").

**2017 Grant Team:  Management**

In 2017, the Grant Team, including Plaintiff, reported to Gary Chee, Manager of the Grants Department, and Chee, in turn, reported to Dennis Flieder ("Flieder"), RAND's Director of Contracting Main Services. Chee has worked for RAND for 15 years and currently is employed as a Senior Contract Administrator IV. Chee works in RAND's Santa Monica, California location. Chee was involved in reviewing Plaintiff's qualifications for the CA I position and in deciding whether to hire Plaintiff as a CA I.

Flieder is currently employed by RAND as Contract Business Advisor. Before that, Flieder worked as Director of Contracting Main Services for about six years. In that role, Flieder oversaw RAND's entire contract function, supporting eight business units in submitting proposals, reviewing and negotiating grant awards, and heading the administration the post-award of contracts. Flieder worked and continues to work in RAND's Santa Monica, California location.

**2017 Grant Team: Contract Administrators**

Typically, RAND's Grant Team has six active contract administrators. Besides Plaintiff, the other CAs on the 2017 Grant Team included Gina Boyd, Shelia Logue, Sounia Johnson, Nathan Kotecki and Robert Hickam. All of those individuals except Plaintiff have at least a bachelor's degree, and all except Boyd have some prior relevant experience related to grants.

1. **<u>Gina Boyd</u>** ("Boyd") has worked for RAND for approximately seven years. Boyd has both Bachelor and Master's degrees from the University of Pittsburgh. Boyd began her career at RAND as an Administrative Assistant until she was promoted to CA I on September 1, 2015. Boyd is equivalent with Plaintiff in terms of their respective grants experience levels.[2]  As a CA I, Boyd was limited to working on subcontracts. In March or April 2017, Boyd was promoted to CA II, the position she currently holds.

2. **<u>Shelia Logue</u>** ("Logue") has worked at RAND for the past seventeen years and currently is employed as a CA III. Logue holds two Bachelor of Arts degrees, and had fifteen years of relevant experience before joining RAND. Her professional, pre-RAND experience includes working as a Grants and Contracts Officer at Harbor-UCLA Research & Education Institute, a Department Administer at the House Ear Institute, and as an Executive Administrator at "MPB." Logue was (and remains) the highest CA III on the Grant Team. Her salary in 2017 was $105,175.46.

3. RAND hired **<u>Sounia Johnson</u>** ("Johnson") as a CA I on March 23, 2016. Johnson was formerly employed by RAND as an Administrative Assistant IV and has a Bachelor's Degree in Public Affairs from Northeastern University. Johnson was not a CA II because her performance "wasn't up to par" and she "wasn't able to perform the CA I tasks." Johnson was assigned to work only on subawards, as those assignments were more simple and straightforward.

4. RAND hired **<u>Nathan Kotecki</u>** ("Kotecki") in 2017 as a CA III. Kotecki, a male, is one of Plaintiff's two named comparators; he left RAND in 2018.

 In 2017, Kotecki's salary was $77,000. Kotecki has an undergraduate degree from Allegheny College and Master's degree from Carnegie Mellon University ("CMU"). Kotecki's

---

[2] Plaintiff disputes this, noting that during the 2018 fiscal year Plaintiff handled nearly 20 more grants and overall financial of $23,000,000 more than Boyd.

pre-RAND work experience included working as the Assistant Director of Research at CMU where he managed and assisted a pre-award team in grant proposals for the Dean's Office of Engineering, as well as handled all of the most complex multi-disciplinary grant proposals submitted across CMU's eight colleges. Before that, Kotecki acted as a Research Administrator for the Dean's Office of Engineering at CMU, handling complex, multi-disciplinary grant proposals submitted across CMU's eight colleges. Prior to that role, Kotecki held the position of Research Administrator at CMU's College of Civil Engineering, handling pre-award grant proposals for civil engineering and sponsors, as well as any other proposals that came through that department.

Chee considered Kotecki to be a "senior" administrator because of Kotecki's experience and viewed Kotecki as someone available to Plaintiff if she had any questions about her assignments.  Kotecki has assisted Plaintiff and Boyd with questions and problems,  on issues with which Plaintiff was unfamiliar, although he was not directed to do so by Chee or Hickam and did not have a supervisory position. Kotecki describes their relationship as "team" working together and assisting each other. Kotecki had more experience than Plaintiff and Boyd.  Boyd (again, a female who was promoted to CA II in 2017) raised her concerns about doing complex grants with Plaintiff and Kotecki and the three of them "muddled" through it together. Kotecki had "a little bit more experience" than Plaintiff and Boyd.

Along with these undisputed facts, Plaintiff notes further evidence related to Kotecki. The first time Kotecki began working with grants in any capacity was six months before his full-time position at Carnegie Mellon University ("CMU") during a six-month temporary assignment. (Pl.'s Concise Stmt. of Facts at para. 58).  Kotecki worked as an assistant accountant in the Civil Engineering department at CMU from November 2012 through November 2013 and estimates

the time he spent related to grants as 5% of his job duties.  (Pl.'s Concise Stmt. of Facts at para. 59, 60).  According to Plaintiff, he had less than five years of working with grants in any capacity when he was hired as a CA III; this would put him at one year less than the low end minimum experience required for the position of CA III. (Pl.'s Concise Stmt. of Facts at para. 62, 63).

     5.  **Robert Hickam** ("Hickam"), a male, has been employed by RAND for the past thirteen years and has been a CA IV since April, 2017. Plaintiff states that Hickam is a CA IV because he is "very smart," calling him a "genius." Hickam works at RAND's Pittsburgh location. Hickam has a Bachelor's degree in English literature and classical languages from the University of Kansas. Prior to being a CA IV, Hickam for worked RAND as a CA II, a CA III, a Unit Administrator, and a level III and IV Administrative Assistant. In October/November 2016, Hickam was appointed to be the "team lead" of the Grant Team. As "team lead," Hickam was responsible for performing day-to-day CA IV duties, as well as managing and monitoring the workflow of the Grant Team, "troubleshooting" for the team, providing subject matter expertise, and mentoring other Grant Team members.

     In April 2017, Hickam began a three-month leave of absence; he has a reduced work schedule of part-time upon his return. In his absence, Chee circulated an email to the remaining team members regarding interim assignments.  The assignments were broken down alphabetically:

| | |
|---|---|
| PI's with Last Name A-B | Gina Boyd (CA II) |
| PI's with Last Name C-H | Nathan Kotecki (CA III) |
| PI's with Last Name I-S | Shelia Logue (CA III) |
| PI's with Last Name T-Z | Stacey Gallaway (CA I) |

(Pl.'s Concise Stmt. of Facts at para. 65, 66).  Plaintiff was the only CA I and was given the same assignments as those holding the CA II and CA III job classifications.  (Pl.'s Concise Stmt.

of Facts at para. 65, 66). Chee had told Gallaway that the differences in the CA positions were

that CA I tasks were subawards, small grants are assigned to a CA II and larger grants are

handled by a CA III. (Pl.'s Concise Stmt. of Facts at para. 68).  Similarly Director Flieder told

Boyd that the job responsibilities for a Contract Administrator were:

> CA I - subcontracts $50,000 or less
>
> CA II - subcontracts and small grants up to $250,000

(Pl.'s Concise Stmt. of Facts at para. 69).

Hickam returned from leave and in Mid-October 2017 revised the workload of the CAs.

(Pl.'s Concise Stmt. of Facts at para. 71).  Hickam then emailed the "Grant Team" with a new

assignment chart

| | |
|---|---|
| Prime awards and subawards, PI last name A-F | Nathan Kotecki (CA III) |
| Prime awards and subawards, PI last name G-L | Gina Boyd (CA II) |
| Prime awards and subawards, PI last name M-R | Stacey Gallaway (CA I) |
| Subawards, PI last name A-F | Sounia Johnson (CA I) |
| Prime awards and subawards, PI last name S-Z | Shelia Logue (CA III) |

(Pl.'s Concise Stmt. of Facts at para. 72). Plaintiff was the only CA I to be assigned both prime

and subawards. (Pl.'s Concise Stmt. of Facts at para. 73). Hickam ran the work distribution by

both Flieder and Chee. (Pl.'s Concise Stmt. of Facts at para. 74). Flieder expressed concern that

Boyd and Gallaway were doing large grants in their portfolios but did not veto the distribution.

(Pl.'s Concise Stmt. of Facts at para. 75). Hickam testified that he thinks Flieder's concern about

them having large grants was "having a deposition like today." (Pl.'s Concise Stmt. of Facts at

para. 76).  Flieder's concern was not necessarily the aggregate total of their work but that Boyd

and Gallaway had big grants in their portfolios. (Pl.'s Concise Stmt. of Facts at para. 77).

Hickam explained that they had taken on that workload when he was on leave. (Pl.'s Concise

Stmt. of Facts at para. 78). And he felt since they had already shown the ability and willingness

to do that work that it was not feasible to go back if the Department was to survive. (Pl.'s Concise Stmt. of Facts at para. 79).

**Plaintiff's Promotion in 2017**

In September 2017, Plaintiff asked Danielle Abfalter (RAND's Human Resource Services Manager for the past four years), that she be promoted "off cycle," from a CA I to a CA III position. An off-cycle promotion is one that occurs outside RAND's January to April performance review cycle period. According to Plaintiff, she requested this two-level promotion because she was performing work "outside the realm" of what Chee told her was CA I-type work.

Plaintiff believes that the ultimate decision maker in deciding whether a person moves into a CA III position is Abfalter. Abfalter was involved in Plaintiff's hire as a CA I, assisting Gary Chee (who was the "hiring manager") by providing feedback for Plaintiff's interview, and to confirm that Plaintiff met all the requirements for the CA I position. To determine whether Plaintiff was qualified for the CA I position, Abfalter reviewed whether Plaintiff had the requisite education and work experience, as well as a minimum one year experience in handing the duties and responsibilities associated with the CA I position.

In addition, in order for Plaintiff to be promoted from her CA I position after her request in 2017, Flieder had to agree to the position change. Chee also had a role in Plaintiff's promotion request, and reviewed Plaintiff's performance and the progression of her development to that time.

The parties dispute whether Plaintiff's experience could not meet the requirements of the move from CA I to CA III.   There is no dispute that at the relevant time, RAND notified Plaintiff that it does not grant "two-level" promotions. Plaintiff admits she has no knowledge of

any CA ever receiving a two-level promotion. According to RAND, at that time, Plaintiff did not have the experience, knowledge or judgment – all of which are gained from exposure to more work in a CA II position – to move from CA I directly to CA III. (Abfalter Depo., 41:18–42:16; Flieder Depo., 34:11-22; Chee Depo., 29:2-13).  Plaintiff asserts that there was nothing different about Plaintiff's work duties as compared to CA III nor was there anything substantially different in the amount of assistance she required. (RH 58/ln. 18-25; 59/ln. 1, App. Ex. 12). In October, 2018 Plaintiff's workload results placed her first for number and amount of grants. (End of FY Stats Email, App. Ex. 26, cited *supra*).

RAND posits that as a CA II, Plaintiff would continue to receive more complex grants, learn how to recognize them, develop grant proposals and learn to effectively manage the post-award grant process. (Chee Depo., 29:14-21). Plaintiff asserts there was nothing different about Plaintiff's work duties as compared to CA III nor was there anything substantially different in the amount of assistance she required either.

Flieder requested that Plaintiff be promoted from a CA I to a CA II. Flieder felt that Plaintiff "was doing a very good job," and was a "good team member" by taking on more work when Hickam was out. Abfalter noticed that the CA II job description did not list "education *or equivalent experience*" at that time. Although Plaintiff did not meet the education requirement for the CA II position per that current job description, it was concluded that she had enough experience to do higher level work. Abfalter requested that each CA job description be changed to list "education minimum or *equivalent experience*." (emphasis added). She further requested that this change take place "as soon as possible" to enable her to submit Plaintiff's promotion.

Plaintiff was promoted to a CA II on December 11, 2017 – out of cycle – and her salary was raised to $73,500. This promotion represented a 10.5% promotion increase in pay, as well as

a 2.9% merit increase.  She currently earns an annual salary of $77,000. Despite being a CA II, Plaintiff's current salary falls within the salary range allotted by RAND for the CA III position.

Plaintiff contends there was nothing different about Plaintiff's work duties as compared to CA III nor was there anything substantially different in the amount of assistance she required either; Hickam testified as much. (RH 58/ln. 18-25; 59/ln. 1, App. Ex. 12). Flieder testified that after Plaintiff was promoted to a CA II, Flieder also began working with Plaintiff more by bringing her into additional meetings with more complicated clients as a means to continue Plaintiff's growth and development as a CA. (Flieder Depo., 32:19-33:4).  He also testified that although RAND's confidence in Plaintiff's abilities continued to grow, Plaintiff still worked more closely with managers on matters involving client negotiations and the redlining of agreements. (Flieder Depo., 35:7-36:2).  For instance, Flieder and Hickam brought Plaintiff into a complicated project that they were handling for the Canadian government in late 2017 or early 2018.

### Changes in the Grant Team, 2018-19

**Kenneth Kadlec** ("Kadlec") joined RAND in December, 2015, as a CA IV, and has been Manager of Contract and Grant Services since December, 2017. As Manager of Contract and Grant Services, Kadlec is responsible for supervising those contract administrators who provide support in RAND's social and economic program research unit. In terms of work distribution, Kadlec works with team leads in making work assignments. In April, 2017, Kadlec replaced Gary Chee and assumed responsibility for the Grant Team. The entire Grant Team had "issues" with Chee and Flieder's management. On June 15, 2018, Flieder was removed as Director of Contracting Main Services.

From around June or July 2018 until June or July 2019, Kadlec reported to Jill Tregillis ("Tregillis"), who is no longer employed by RAND. Tregillis was located in RAND's Santa Monica, CA, office. According to Kadlec, Tregillis told him that there would be no promotions in the 2019 cycle because "it was a management/policies situation where she [Tregillis] had been told she could get some management positions in place or she could promote staff."

Sounia Johnson, who is no longer employed by RAND, never advanced beyond the CA I position and, during her tenure, was not assigned any work beyond sub-awards because she never demonstrated a skill level capable of completing anything beyond these simpler and straightforward awards. During her employment as a CA I, Johnson's annual salary was $63,396.

Kotecki, who left RAND for a new job in May 2018, testified that while at RAND he understood his workload assignment to be based on his level of experience, and that the difference between CA positions were based on experience and the complexity of "what you've done before." (Kotecki Depo., 18:23-25, 28:12-19).  As will be discussed *infra*, Plaintiff contends  that caseloads were assigned by the last name of the investigator/researcher.

**RAND Hires Gallagher, West and Greenfield**

In 2018, the Grant team changed with the departure of Kotecki and entry of three new individuals.

1. **Christine Gallagher** ("Gallagher") joined RAND in 2018 as a CA III. Gallagher has a Graduate Certificate in Geospatial Intelligence Analytics, a Master of Public Policy and Management degree from the University of Pittsburgh, and a Bachelor of Science and Business Administration from Robert Morris University. Before working at RAND, Gallagher was an Assistant Business Manager at CMU, overseeing a portfolio of multi-disciplinary grants and contract proposals; a Consultant-Senior Research Grant Specialist at the University of

14

Pittsburgh; a GIS Assistant and Research Administrator the University of Pittsburgh; and a Senior Analyst/SME at Bank of New York Mellon. Gallagher is the "most contract orientated" of the CA IIIs, and has a degree in contract management. Gallagher's current salary is $82,160.

2.  In 2018, RAND hired **Joel West** ("West") as a CA III.  West, a male, is the second of two comparators named by Plaintiff.

West has a Master of Business Administration degree (2010) from Point Park University, as well as a Research Administration Certificate (2017). Before joining RAND, West's experience included, Research Administrator for CMU's college of Engineering, Mechanical Engineering; Research Administrator at Children's Hospital of UPMC; and Senior Tax Specialist/Accounting Analyst at Bank of New York Mellon. West's current salary is $81,600.

3.  **Anissa Greenfield** ("Greenfield") currently is a CA III with RAND. Greenfield has a Bachelor of Science degree in neuroscience from the University of Pittsburgh (2000); is a Certified Research Administrator, Research Administrators Certification Council (2017); and a Certified Pre-Award Research Administrator, Research Administrators Certification Counsel (2011). Before working at RAND, Greenfield was a Manager in Sponsored Research Administration at CMU's Electrical & Computer Engineering Department; a Senior Pre-Award Administrator at CMU'S Office of Sponsored Programs; a Senior Sponsored Research Administrator at Sanford Burnham Prebys Medical Discovery Institute; a Research Manager at University College of London; a Project Coordinator at the UCLID Center at the University of Pittsburgh; and Research Specialist at the University of Pittsburgh, School of Medicine. Greenfield's current salary is $89,100. Anissa Greenfield is currently responsible for making work assignments for the Grant Team.

### Logue, Boyd and Plaintiff

In 2018 and 2019, Logue's salary remained unchanged at $105,175.4; Logue is a CA III. Again, Logue was the highest paid CA III on the Grant Team and has 17 years' experience at RAND. Boyd and Plaintiff, who both currently hold CA II designations, earn $77,000 annually and their salaries are within the salary range designated for a CA III.

### Fiscal Year 2018 Data

Defendant's fiscal year ended on September 30, 2018. (Pl.'s Concise Stmt. of Facts at para. 82). Hickam ran a Fiscal Year Breakdown showing the number of grants all the CA's submitted and their aggregate total dollar amount submitted. (Pl.'s Concise Stmt. of Facts at para. 83). The fiscal year 2018 breakdown for the "Grant Team" was:

| Row Labels | Count of Document Number | Sum of Amount |
|---|---|---|
| Boyd, Gina | 74 | $69,475,074.00 |
| Gallagher, Christine | 40 | $40,885,153.00 |
| Gallaway, Stacey | 92 | $92,816,261.00 |
| Hickam, Robert | 43 | $57,959,657.00 |
| Johnson, Sounia | 47 | $14,341,220.00 |
| Kotecki, Nathan | 45 | $50,971,178.00 |
| Logue, Sheila | 57 | $66,025,264.00 |
| West, Joel | 16 | $16,564,420.00 |

(Pl.'s Concise Stmt. of Facts at para. 83). According to Hickam Plaintiff's workload was too high even if she had been in the CA III position then; following creation of that chart, work was reassigned so that CAs were given work both by alphabet and specific area of work. (Pl.'s Concise Stmt. of Facts at para. 85, 87). At the time of this reassignment there was no difference in Gallway's duties and those of the CA III. (Pl.'s Concise Stmt. of Facts at para. 91).

## II.      Standard of Review

Summary judgment may be granted where the moving party shows that there is no genuine dispute about any material fact, and that judgment as a matter of law is warranted. Fed. R. Civ. P. 56(a). Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In evaluating the evidence, the court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

In ruling on a motion for summary judgment, the court's function is not to weigh the evidence, make credibility determinations, or determine the truth of the matter; rather, its function is to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150–51 (2000) (citing decisions); *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–19 (1986); *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n. 3 (3d Cir. 1998).

The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment. Only a dispute over a material fact—that is, a fact that would affect the outcome of the suit under the governing substantive law—will preclude the entry of summary judgment. *Liberty Lobby*, 477 U.S. at 248.

## III.     Discussion

### A.  Equal Pay Act Claim:  Count I

Plaintiff alleges that RAND violated the Equal Pay Act by paying wages to her that are less than those paid by RAND to male employees for equal work on jobs requiring equal skill, effort and responsibility, and performed under similar working conditions. The "male

employees" whom Plaintiff specifically alleges were paid more are Nathan Kotecki and Joel West.

### 1. Applicable Burden-Shifting Framework

An Equal Pay Act case requires shifting burdens.[3] *EEOC v. Delaware Dep't of Health & Soc. Servs.,* 865 F.2d 1408, 1413 (3d Cir.1989). To establish a prima facie case under the Equal Pay Act, a plaintiff must show that defendant paid different wages to employees of the opposite sex for equal work on jobs which required equal skill, effort, and responsibility, and all of which are performed under similar working conditions. *Dubowsky v. Stern,* 922 F. Supp. 985, 990 (D.N.J.1996.) Plaintiff must show that she was paid unequally for "substantially equal" work. *Del. Dep't of Health,* 865 F.2d at 1413.

If a plaintiff is able to make a prima facie case, the burden shifts to the defendant to raise one of the four affirmative defenses stated in the Equal Pay Act. The four affirmative defenses include three that are "specific and one general catchall." *Corning Glass Works v. Brennan,* 417 U.S. 188, 196–97, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). A difference in payment between opposite sexes is permissible if it is made pursuant to: (1) a seniority system, (2) a merit system, (3) a system which measures earnings by quantity or quality of production, or (4) a system based upon any other factor other than sex (the "catchall defense"). *Id.*

---

[3] The Equal Pay Act states, in relevant part:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C. § 206(d)(1).

RAND asserts the fourth affirmative defense, the "catchall defense." As to its burden, an employer cannot prevail at the summary judgment stage based upon an affirmative defense unless it can prove the existence of the affirmative defense "so clearly that no rational jury could have found to the contrary." *Del. Dep't of Health,* 865 F.2d at 1414. Under the Equal Pay Act, Plaintiff does not need to prove that an employer intended to discriminate. A showing of intent, however, may be used to establish that an employer's affirmative defense is a pretext for discrimination. *Del. Dep't of Health,* 865 F.2d at 1414.

### 2. Plaintiff's Prima Facie Case

In order to establish a prima facie case, Plaintiff must show that she was paid less than males for performing work of substantially equal skill, effort, and responsibility, under similar working conditions. *Dubowsky,* 922 F.Supp. at 990. It is well settled that the jobs need not be identical in every respect. *See Corning Glass Works,* 417 U.S. at 204, 94 S.Ct. 2223. Equal means substantially equal and "[a]ny other interpretation would destroy the remedial purposes of the Act." *Shultz v. Wheaton Glass Co.,* 421 F.2d 259, 265 (3d Cir.1970). This standard does not provide an employer with a justification for paying employees of one sex less than employees of the opposite sex because of inconsequential or trivial differences in their respective duties. *Usery v. Allegheny County Inst. Dist.,* 544 F.2d 148, 152–53 (3d Cir.1976). The critical question with respect to the issue of "equal work" is whether the jobs being compared have a "common core" of identical (or substantially similar) tasks. *Brobst v. Columbus Servs. Int'l,* 761 F.2d 148, 156 (3d Cir. 1985). If this question yields a positive answer, the inquiry turns to whether "additional tasks" required by either of the jobs make the work performed by the different employees filling those jobs "substantially different." *Id.*

In determining whether jobs require equal skill, equal effort, or equal responsibility, the court must conduct separate analyses. 29 C.F.R. § 1620.14(a).

> This inquiry is informed by the [Equal Pay Act]'s implementing regulations, which provide that "[s]kill includes consideration of such factors as experience, training, education, and ability," 29 C.F.R. § 1620.15(a); "[e]ffort is concerned with the measurement of the physical or mental exertion needed for the performance of a job," 29 C.F.R. § 1620.16(a); and "[r]esponsibility is concerned with the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation," 29 C.F.R. § 1620.17(a).

*Drury v. Waterfront Media, Inc.,* No. 05 Civ. 10646, 2007 WL 737486, at *3 (S.D.N.Y. Mar. 8, 2007). In considering whether the positions require equal skill:

> It must be measured in terms of the performance requirements of the job. If an employee must have essentially the same skill in order to perform either of two jobs, the jobs will qualify under the [Equal Pay Act] as jobs the performance of which requires equal skill, even though the employee in one of the jobs may not exercise the required skill as frequently or during as much of his or her working time as the employee in the other job. Possession of a skill not needed to meet the requirements of the job cannot be considered in making a determination regarding equality of skill.

29 C.F.R. § 1620.15(a). Job descriptions are not determinative. The relevant inquiry focuses upon the content of the position. *Wildi v. Alle-Kiski Medical Center*, 659 F.Supp.2d 640, 659-660 (W.D. Pa. 2009). "[W]hen a court assesses the substantial equality between jobs, it should rely on actual job performance and content rather than job descriptions." *Heller v. Elizabeth Forward Sch. Dist.*, 182 Fed. App'x. 91, 95 (3d Cir.2006). The court therefore must analyze the evidence of the actual job duties performed. *Wildi*, 659 F.Supp.2d at 660. "Factors to be considered in determining whether tasks are similar include whether they require similar quality and quantity of production, education, relevant prior work experience, conduct and skill." *Dubowsky*, 922 F. Supp. at 990 (citing 29 C.F.R. § 1620.13).

If a court determines that the jobs share a common core of tasks, "[t]he inquiry then turns to whether the differing or additional tasks make the work substantially different." *Brobst*, 761 F.2d at 156; *see Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 695 (7th Cir. 2006) ("Once a plaintiff establishes a common core of tasks, we ask whether any additional tasks make the jobs

substantially different") (internal quotations omitted). To resolve this issue, courts should only

consider the qualifications and skills necessary to perform the job, not the specific qualifications

of the employees who occupy the positions. *Cox v. Office of Attorney Ethics of the Supreme

Court of New Jersey*, No. 05–1608, 2006 WL 3833470, at *6 (D. N.J. Dec. 29, 2006); *see

Hodgkins v. Kontes Chemistry & Life Scis. Prod.*, No. 98–2783, 2000 WL 246422, at *15 (D.

N.J. Mar. 6, 2000) (noting that the "comparative skill or quality of work" among the workers is

irrelevant). In other words, at this stage of the analysis, the focus of the inquiry is on the job, not

on a comparison of the individual abilities of the employees. Ultimately, a finding that jobs entail

equal work must be decided case-by-case. *Brobst*, 761 F.2d at 156; *Heller v. Elizabeth Forward

Sch. Dist.*, 182 Fed. App'x 91, 95 (3d Cir. 2006) ("Moreover, because of the heavily fact-driven

character of the inquiry, substantial equality must be determined on a case-by-case basis").

Only one comparator is required.  Even if the other relevant CA positions could be

viewed as different under the Equal Pay Act, Plaintiff only needs one comparator to establish her

claim, and the similarities of her position and that position would suffice. *See EEOC v. White &

Son Enters.*, 881 F.2d 1006, 1009 (11th Cir.1989) ("[The EEOC] need only show discrimination

in pay against an employee vis-a-vis one employee of the opposite sex [to establish a violation of

the Equal Pay Act]."); *Ames v. Verizon Data Services, Inc.*, No. 8:07–cv–00698–T–24–TGW,

2008 WL 3927262, at *2 (M.D. Fla. Aug. 21, 2008) ("To establish a violation of the Equal Pay

Act, Plaintiff must show pay discrimination between herself and at least one comparator of the

opposite sex.").

RAND notes the following undisputed facts in support of its motion for summary

judgment.  First, there are at least three female CAs – Sheila Logue, Anissa Greenfield, and

Christine Gallagher – who are earning substantially more than she is, based on the experience that they bring to the CA position, and the increased responsibilities of the CA III role. The other CA II (Gina Boyd) currently earns exactly the same annual salary as does Plaintiff. (SOF ¶ 112.) No CA II on the Grant Team, male or female, is or was paid a higher salary than Plaintiff.

Second, RAND asserts that Plaintiff's Equal Pay Act claim is based on the incorrect assumption that all CAs in both the II and III designations do "equal work," and should be paid the same salary.    According to RAND, there has been substantial testimony from managers about how the positions differ, suggesting that in transitioning through the CA levels, RAND's design is not that an increased CA level gets more work (in fact, individuals with easier assignments can complete more of them in the same amount of time).  Instead, the work differs qualitatively, in that it progresses along a continuum from "routine" to "complex." (SOF ¶¶ 125-155.)  For instance, RAND notes, the difference between a CA I and CA II is the level of routine/sameness of the work, and the amount of supervision required. (SOF ¶¶ 125, 129-131.) RAND wants the CA I work to be the most routine and, although many functions and types of the functions performed between CA I and CA II are similar, the types of agreements that the respective positions handle becomes less routine – that is, RAND expects that a CA II can do less routine work with less supervision. (SOF ¶ 129.)

In response to Plaintiff's citation to the alphabetically-based assignment of work, RAND notes that although alphabetical assignments were made, the respective letters assigned to each CA specifically heeded the CA's level of expertise and experience. (SOF ¶¶ 132-155.) According to RAND, it has a delineated "spectrum" of CA expertise level.  Chee explained the differences between a CA II and a CA III: "Again, the complexity rises as you advance to higher levels. The type of projects you might be involved in are more complex, require additional

knowledge. The experience you gain getting to that point is utilized more in your problem-

solving . . . ." (SOF ¶ 130.)  In addition, when questioned about the differences in what Joel

West, a CA III, and Plaintiff, a CA II, do in their respective jobs, Kadlec explained:

> [I]t's a level of experience and knowledge that's one of the primary
> differentiators in, sort of, the spectrum. She is doing much of the
> same work that they do in assignments and otherwise, but the 3's,
> many have more years of experience and are more familiar with
> some of the detailed requirements, and processes within the work
> assignments that they have**.**

(SOF ¶ 131.)

Plaintiff argues that with respect to her comparators, as opposed to other females, she was

paid less.  In support of this claim she notes that Plaintiff was being paid $64,817 a year as of

December 7, 2017 as CA I (Salary Range Document, App. Ex. 28). She was then raised to

$73,500 on December 11, 2017 when Defendant promoted her to a CA II. Plaintiff now makes

$77,000 a year and remains a Contract Administrator II. (DSMF ¶ 10, ¶13).  Defendant hired

Kotecki 2017 at a rate of $77,000 a year and in 2018 his salary was raised to $80,540. (PSMF ¶

11). Kotecki left employment with Defendant in 2018. (PSMF ¶ 29).  West was hired in 2018 at

$80,000 a year and currently makes $81,600. (PSMF ¶ 12).

Plaintiff argues the evidence supports her claim that she performed substantially equal

work to that of her two male comparators. Gary Chee, Plaintiff's supervisor, told her that the

differences in CA positions was that CA I tasks were subawards, CA II's were assigned small

grants and CA IIIs handled large grants. (PSMF ¶ 68). Similarly, Plaintiff's female co-worker,

Gina Boyd, who is a CA II was told by the Department Director Dennis Flieder that CA Is

handled subcontracts of $50,000, CA II's handled subcontracts and grants up to $250,000 and

CA IIIs had no limit on the grant amounts they were assigned. (PSMF ¶ 69-70). Boyd and

Plaintiff's work proceeded in that way until Robert Hickam, the Department's Team Lead, took a

medical leave in the spring of 2017. At that time Plaintiff and Boyd were assigned large awards identified as CA III assignments. (PSMF ¶ 64-67, ¶ 77-78).

Once Hickam returned full-time in October 2017 he reassigned the work among the Contract Administrators. He did so with Chee and Flieder's approval.  As part of the reassignment Plaintiff and Boyd continued to be assigned large grants permanently. (PSMF ¶ 77-78). Hickam felt it was necessary because they had already done that work and it was necessary for them to continue to do so for the Department to survive. (PSMF ¶ 78-79).

Plaintiff further notes that Hickam testified that Plaintiff performs the same duties and requires the same substantive level of supervision as the CA IIIs. (PSMF ¶ 56, ¶ 91).  And Plaintiff notes that when Hickam reassigned the work in October 2017 he did so alphabetically by the last names of the Principal Investigators. (PSMF ¶ 81). In distributing the work Hickam was looking at the sum amount of awards the Contract Administrators received and the aggregate amount of grant money they were responsible for. (PSMF ¶ 81). He testified that he tried to give the more experienced and more tenured Contract Administrators more awards. (DSMF ¶ 48).

Yet when Hickam ran the statistics for the period of October 2017 until October 2018,  out of all the Contract Administrators, regardless of classification, Plaintiff had the most awards and the highest aggregate total of grant money by a large margin. (PSMF ¶83). Hickam admits Plaintiff successfully handled a heavy case load and that it was too much work even for a CA III.1 (PSMF ¶83-85).

After a careful review of the record, and viewing the evidence in a light most favorable to the non-movant, we conclude based on the differences in the "skill, effort, and responsibility" required among the various CA levels, a reasonable fact finder could conclude Plaintiff performed substantially equal work on jobs under similar working conditions to the work West

and Kotecki performed.  Plaintiff handled large grants designated as CA III level work.   A reasonable jury could reject RAND's claim  Plaintiff was paid less than West and Kotecki because she lacked experience or did less complex work. There is evidence that she performed the same duties and required the same substantive level of supervision as the CA IIIs in the same department where West and Kotecki worked, and she handled a case load heavier than all CAs in the department.   Plaintiff has adduced sufficient evidence that a reasonable finder of fact could conclude that the similarities between her position and the comparators' positions were substantial enough to establish a prima facie claim under the Equal Pay Act.  Plaintiff thus has adduced sufficient evidence to raise a genuine dispute of material fact with respect to her prima facie case under the Equal Pay Act.

### 3. Affirmative Defenses

Under the burden-shifting framework of the Equal Pay Act, the next step is to analyze whether RAND has adduced sufficient evidence to prove an affirmative defense as a matter of law.  The defendant must prove one of the four affirmative defenses "so clearly that no rational jury could have found to the contrary." *Del. Dep't of Health*, 865 F.2d at 1414. Consequently, in an EPA claim, "an employer must submit evidence from which a reasonable factfinder could conclude that the proffered reasons actually motivated the wage disparity." *Stanziale v. Jargowsky*, 200 F.3d 101, 108 (3d Cir. 2000). In other words, evidence that merely "*could* explain the wage disparity" is insufficient, rather "the proffered reasons" *must* "explain the wage disparity." *Id*. at 107–08.

Here, defendant raised the "catchall defense," i.e. a system based upon any other factor other than sex. *Brennan*, 417 U.S. at 196–97, 94 S.Ct. 2223.  Defendant notes the following to support its defense that Plaintiff as a CA II and others as CA IIIs, are paid unequal wages based on factors other than gender:

• Plaintiff has substantially less relevant experience than her named comparators, Nathan Kotecki and Joel West. (SOF ¶¶ 12-16, 44-51).

• Because the complexity level of the work among CAs rises with each step, and each step builds on the previous ones, Plaintiff did not have the requisite experience to "skip a step" in the progression in 2018, after she was made a CA II out-of-cycle (with an attendant salary increase), with only 13 months in the CA I position. (SOF ¶¶ 60, 69-71, 16, 78-79).

• There were no promotions during the 2019 cycle, based on corporate management directives. (SOF ¶¶ 90-92, 113).

• Plaintiff has received a salary increase during her time in the CA II role that places her within the salary range for CA IIIs. (SOF ¶¶ 113-118).

• There have been no roadblocks placed in Plaintiff's way toward a promotion during the 2020 cycle, as her experience continues to increase. (SOF ¶¶ 82-83, 114-117, 154).

• Plaintiff is paid equally with the other CA II, a female Caucasian. (SOF ¶¶ 31, 113).

• There are three female CA IIIs, all of whom were hired directly into the CA III level based upon their prior experience, and all of whom are paid more highly than Plaintiff (one of the three being the highest paid CA III employee – male or female – on the Grant Team). (SOF ¶¶ 34-37, 98-102, 107, 112.)

ECF No. 26 at 13-14.

Plaintiff has cited record evidence that when Kotecki was hired, he did not have the relevant experience RAND's position description claims was required for the CA III position: Kotecki had one less year than the required minimum.   In contrast to RAND's cited evidence that Plaintiff did not have the requisite experience to be a CA III, both Plaintiff and Boyd were told that the difference in the CA positions was CA Is worked with subcontracts, CA IIs smaller grants, and CA IIIs an unlimited grant size.     In addition, when Hickam, as team leader, assigned the case loads, Plaintiff carried the heaviest caseload; Hickam claims he assigned the heavier caseload to CA's with the most experience and tenure.  Plaintiff was given assignments consistent with CA IIIs; there is evidence Plaintiff successfully handled this caseload.  And

although Plaintiff received a salary increase which put her within the salary range of CA IIIs, she was paid less than Kotecki and West were in 2017 and 2018.  She now earns $77,000. This is less than the $80,540 Kotecki made in 2018 and the $81,600 that West earned upon hiring in 2018.  These facts, among others, lead us to conclude that RAND has not met its burden of persuasion with respect to the catch all affirmative defense, i.e. the affirmative defense has not been proven  "so clearly that no rational jury could have found to the contrary." *Delaware Dept. of Health*, 865 F.2d at 1414; *see also Dubowsky*, 922 F. Supp. at 933.

### 4.  Pretext

Because we have concluded that defendant has not met its burden as to the affirmative defense, we need not reach the question of whether the record evidence supports a theory that RAND's explanation is pretextual.  We note, however, that there do appear to be inconsistencies and contradictions that may be sufficient create the inference of pretext, such that the issue should be reserved for trial.

### B.  Plaintiff's Race Discrimination Claims Waived:  Counts II and III

In its Memorandum of Law in Support of its Motion for Summary Judgment, RAND presented arguments and evidence in support of the entry of judgment in its favor as to any race-based discrimination.  Plaintiff has not responded specifically to any of these arguments in her Brief in Opposition (ECF No. 31).  Thus, RAND argues in its Reply in Support of its Motion for Summary Judgment that we can only logically conclude that Plaintiff concedes the claims of discrimination based on her race are without merit and must be dismissed as a matter of law. (ECF No. 35 at 1-2).   These arguments are well-founded. Plaintiff has abandoned her race discrimination claims by failing to respond to Defendant's Motion for Summary Judgment on those claims. *Nykiel v. Borough of Sharpsburg*, 778 F. Supp. 2d 573, 588 (W.D. Pa. 2011); *Venter v. Potter*, 694 F. Supp. 2d 412, 425 n.8 (W.D. Pa. 2010).

Judgment in favor of RAND will be entered as to the claims for racial discrimination in violation of Title VII at Count II, and for racial discrimination in violation of 42 U.S.C. § 1981 at Count III.

### C.  Title VII Gender Discrimination Claim:  Count II

Plaintiff further alleges gender discrimination in violation of Title VII, 42 U.S.C. Section 2000e-2(a)(1). To establish a *prima facie* case of pay discrimination under Title VII, a plaintiff must show that she was: (1) a member of a protected class; (2) qualified for the position (3) suffered an adverse employment action; and (4) similarly situated non-protected employees, i.e. "comparators," were treated more favorably. *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 522 (3d Cir. 1993); *Summy-Long v. Pennsylvania State Univ.*, 226 F. Supp. 3d 371, 395 (M.D. Pa. 2016), aff'd, No. 17-1206, 2017 WL 5125627 (3d Cir. Nov. 6, 2017) (citing *Johnson v. McGraw-Hill Companies*, 451 F. Supp. 2d 681, 691 (W.D. Pa. 2006)). "While 'similarly situated' does not mean identically situated, the plaintiff must nevertheless be similar in all relevant respects." *Opsatnik v. Norfolk Southern Corp.*, 335 Fed. App'x 220, 222–23 (3d Cir. 2009) (internal citations and quotation marks omitted). To meet this initial burden, a plaintiff must demonstrate that she was "performing work substantially equal to that of the [male] employees who were compensated at higher rates" than she was. *Summy-Long*, 226 F. Supp. 3d at 395 (quoting *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1087 (3d Cir. 1996)).

In its motion, Defendant concedes Plaintiff has met the first two elements of her gender discrimination claim, because she is a female and has performed the duties of the CA III position in a satisfactory manner.  RAND  argues that Plaintiff cannot establish the third or fourth elements.  Our analysis of these two elements RAND's motion is aided in large part by the reasoning as to the Equal Pay Act claim, *supra*.  As to the third prong, there is a genuine dispute of material fact that Plaintiff suffered an adverse action when she was paid less than her male

comparators who performed similar duties.  Plaintiff has shown evidence in support of her claim

that she was paid less than Kotecki and West despite performing the same duties.    As to the

fourth prong, there is sufficient record evidence to allow a reasonable factfinder to conclude that

Plaintiff's performance of the same duties under the same level of supervision gives rise to an

inference of unlawful discrimination.  *See Clark v. Johnson & Higgins*, 181 F.3d 100 (6th Cir.

1999) ("This court has held that when an Equal Pay Act claim and a Title VII claim arise out of

the same set of underlying facts, both stating a charge of wage discrimination, the standards of

liability under the two statutes are sufficiently similar that the disposition with respect to the two

claims should be the same.") (internal citations and quotation marks omitted).

   As Plaintiff has met her burden of proving her *prima facie* case, the burden of production

shifts to RAND to articulate a legitimate non-discriminatory reason for the adverse employment

decision.  *Sarullo v. U.S. Postal Serv*., 352 F.3d 789, 797 (3d Cir. 2003). Defendant has

presented numerous reasons for the pay discrepancy, yet there is a genuine dispute of material

fact as to those reasons.  Again, Plaintiff has presented evidence that she performed the same

level of work at the same level of supervision as her male CAs who were paid more than she

was.

   Even if RAND has articulated a legitimate non-discriminatory reason for the pay

discrepancy, Plaintiff's claim would survive summary judgment if she establishes by a

preponderance of the evidence that the employer's proffered reasons were merely a "pretext for

discrimination, and not the real motivation for the unfavorable job action."  *Id.* A plaintiff may

demonstrate pretext, and so defeat a motion for summary judgment, by either "(i) discrediting the

proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether

circumstantial or direct, that discrimination was more likely than not a motivating or

determinative cause of the adverse employment action." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994).  As noted above, and supported by the record, a reasonable jury could reject the defendant's proffered reasons for the pay discrepancy as being pretext for discrimination.

Accordingly, Defendant's motion for summary judgment will be denied as to the gender discrimination claim alleged in Count II.

## IV.  Conclusion

For these reasons, the Motion for Summary Judgment will be granted as to the race discrimination claims at Count II and III.  It will be denied as to Count I and the gender discrimination claims in Count II.   An appropriate order will be entered contemporaneously herewith.


DATED:  April 27, 2020

/s/*Robert J. Colville*
Robert J. Colville
United States District Judge

CC:  Counsel of record via CM-ECF